Geoffrey **TYLER, et al.,** Petitioners,

v.

## DISTRICT OF COLUMBIA BOARD OF ZONING ADJUSTMENT, Respondent,

**Bronberg, Inc.,** Intervenor.

No. 90–1418.

District of Columbia Court of Appeals.

Argued March 12, 1992.
Decided April 17, 1992.

753 (D.C.1990) ("A court may not supply a rationale for the agency decision by conjecture from what it did"); *Gilmartin v. District of Columbia Bd. of Zoning Adjustment*, 579 A.2d 1164, 1171 n. 6 (D.C.1990) ("court may not substitute its reasoning for BZA's when that reasoning appears to be lacking in its order").

James T. Draude, Washington, D.C., for petitioners.

C. Francis Murphy, with whom Louis P. Robbins and Jonathan L. Farmer, Washington, D.C., were on the brief, for intervenor.

John Payton, Corp. Counsel and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a Statement in Lieu of Brief for respondent District of Columbia Bd. of Zoning Adjustment.

Before ROGERS, Chief Judge, FARRELL, Associate Judge, and PRYOR, Senior Judge.

FARRELL, Associate Judge:

In granting the two area variances disputed here, the Board of Zoning Adjustment (BZA or Board) stated that its decision was not, and could not be, "based on economic factors." Because we are unable to determine from the Board's decision what *non*-economic factors formed the basis of the decision, and because we think the Board's disavowal of reliance on economic considerations (despite explicit testimony by the applicant's witnesses that these motivated the request for variances) may reflect a misunderstanding of our precedents, we must vacate the decision and remand the case to the Board for further consideration. Either the Board must explain the non-economic reasons that justified the disputed variances, or it must expressly consider the evidence of economic feasibility offered in support of the application. *See Levy v. District of Columbia Bd. of Zoning Adjustment*, 570 A.2d 739,

I.

The property at issue is located at 2521–2523 K Street, N.W., and is improved by two townhouses (known as the Cooper Houses) which have been designated historic landmarks. Applicant Saint James Washington Limited Partnership (St. James) is the current owner of the property, and intervenor Bronberg, Inc. has a contract to purchase the property contingent on the grant of the requested variances. The BZA granted St. James six variances to permit construction of a twenty-unit apartment building on the property which would preserve and incorporate the Cooper Houses. Petitioners, who are area residents, oppose only two of the variances granted. The first would permit a variance from the maximum allowable height (90 feet)[1] to provide for a residential apartment building 107.5 feet in height. The second would permit a variance from the maximum allowable FAR (Floor Area Ratio) of 6.0[2] to provide for a FAR of 7.7.

The Cooper Houses were designated landmark buildings in 1984.[3] After an application for a permit to demolish the buildings was denied by the Mayor's agent, D.C.Code § 5–1004, the former property owner obtained certain variances from the zoning regulations to construct an apartment building on the remainder of the site, but then abandoned the project. Bronberg, Inc., in conjunction with its (contingent) purchase of the property from the present owner, St. James, originally offered a plan to leave intact and incorporate the facade of each of the Cooper Houses but otherwise to demolish them. Opposition to this

[1]. 11 DCMR § 400.1 (1987).

[2]. 11 DCMR § 402.4 (1987) (R–5–D, or high density residential, use).

[3]. *See* Historic Landmark and Historic District Protection Act of 1978, D.C.Law 2–144, D.C.Code §§ 5–1001 *et seq.* (1988).

plan resulted in a revised proposal from Bronberg which, as finally approved by the Historic Preservation Review Board, permitted temporary partial demolition of the houses, to be followed by their complete restoration using original materials after the apartment building was erected. The Cooper Houses would then constitute two single-family dwellings incorporated into the twelve-story apartment building constructed behind them.

A hearing on the application for the six variances (together with a request for a special exception pertaining to the roof structure) took place before the BZA on October 25, 1989. The Board had received the recommendations of Advisory Neighborhood Commission (ANC) 2A and the Office of Planning in favor of the variances. ANC–2A applauded Bronberg's agreement to preserve the two historic structures rather than merely the facades, since the Cooper Houses are "the oldest houses remaining in the Foggy Bottom area and among the oldest in the city." At the same time, ANC–2A acknowledged that the houses were "in precarious condition, not likely to last another year," having been the victim of years of neglect and recent fires and vandalism. In favoring the variances, ANC–2A recognized that the need to preserve the entire structures "had added significantly to [the developer's] costs by reducing usable space within the structure, and requiring additional major expenditures to retain the integrity of the total structures of the Cooper Houses." ANC–2A noted that Bronberg's president had made available to the ANC's consultant "a financial statement ... prepared in connection with a [construction] loan application," and that "the figures were reasonable." The Office of Planning likewise affirmed that "the presence of the landmark structures on the property has created the need for the requested variances," since "[w]ithout the [Cooper Houses], the applicant could develop a comparable 20–unit residential building, as a matter-of-right without variance relief."

Testifying before the Board, Gerald I. Goldberg, Bronberg's president, stated that the FAR and height variances were necessary, in essence, "to make this economically feasible." Echoing ANC–2A's conclusion that the Cooper Houses—uninhabited since 1983—were "in a terrible state of disrepair ... that continues to get worse," Goldberg explained that the obligation to preserve them imposed by the Historic Preservation Review Board made construction of the apartment building "very expensive ... because of the great area that the historic buildings cover." In particular, the need to depart from the normal FAR limitations was

> strictly one of economics. The [cost of the] restoration of these town houses will far exceed the ... income that we can derive from the resale of these town homes....
>
> In order to have a design which fits in with the historic structures, which fits in with the scope of the block, we have a very, very complex structure. This cost has to be recovered through the sale of square footage, of retail square footage.
>
> We have done an economic balance to determine the amount of FAR that we had to market if we ... would be able to build the project. That then drove the height, because the only place that we were allowed to build by the Historics Board [sic] was back and up.

According to Goldberg, since the "debt ratio coverage" reflected in the proposed plan had "no excess," a construction loan could not be obtained without the height and FAR variances: "If you take anything out of that building ... the equation no longer balances and you can't get a construction loan. So, it's really like a no-go game."

The project architect testified and confirmed that the restoration of the Cooper Houses would mean "a negative economic value" without the variances. Among other things, incorporation of the two-story homes into the apartment building would result in there being no "new saleable area" in the building up to a height of twenty feet. According to the architect, the "additional FAR, additional density on the site helps us offset the cost of restoring the Cooper homes, and that's really what Mr. Goldberg is requesting here."

In its decision granting the FAR and height variances, the BZA acknowledged the architect's testimony that "the additional height compensates for the inability to build anew on the front of the lot." It also took note of opposing testimony by the representative of ANC–2A–03, the single-member district in which the property is located, "that the developer failed to support his statement that resulting profits from the project would be exceeded by the cost of preserving the Cooper Houses if the FAR and height variances are not granted." Nevertheless, as we pointed out at the beginning, the BZA expressly concluded "that its decision in this matter cannot be based on economic factors," and therefore determined that "detailed financial information from the developer would be irrelevant." In denying petitioners' application for reconsideration, the Board reemphasized the point that its "conclusions are not based on economic factors." Instead, after setting forth the legal standard for the grant of variances, the Board concluded:

> In the Board's opinion, the narrowing of the lot at the rear, the location of neighboring structures at their contiguous property line and the presence of the landmark structures creates an exceptional condition in the development of the property. The applicant is required to restore, preserve and design around the historic structures. The applicant is unable to demolish them and construct a new building that would not need variance relief. The Board therefore concludes that this is an exceptional condition which creates a hardship for the owner in meeting the requirements of the Zoning Regulations.

## II.

■ The BZA may grant variances under D.C.Code § 5–424(g)(3) (1988); *see also* 11 DCMR § 3107.2 (1987). The applicant for a variance has the burden of showing:

first, that the property is unique because of some physical aspect or "other extraordinary or exceptional situation or condition" inherent in the property; second, that strict application of the zoning regulations will cause undue hardship or practical difficulty to the applicant; and third, that granting the variance will do no harm to the public good or to the zone plan.

*Gilmartin,* 579 A.2d at 1167 (quoting *Capitol Hill Restoration Society v. District of Columbia Bd. of Zoning Adjustment,* 534 A.2d 939, 941 (D.C.1987)).[4] Petitioners do not dispute that the need to preserve the Cooper Houses created an "exceptional situation" within the meaning of the statute. As the BZA found, "[t]he applicant is unable to demolish [the houses] and construct a new building that would not need variance relief." Petitioners' challenge, rather, is to the Board's finding of "practical difficulty" and its determination that the exceptional condition of the property justified the FAR and height variances requested. Petitioners concede that in the case of area variances (in issue here) as distinct from use variances, an applicant is not required to show "undue hardship" but must satisfy only "the lower 'practical difficulty' standard," *Gilmartin,* 579 A.2d at 1170 (quoting *Palmer v. District of Columbia Bd. of Zoning Adjustment,* 287 A.2d 535, 540–41 (D.C.1972)). Petitioners contend, however, that St. James and Bronberg failed to demonstrate—and the Board failed to find— any connection between the exceptional condition of the property and the FAR and height variances *other than* the economic justification offered by the applicant but which the Board rejected in eschewing reliance on "economic factors."

■ We are forced to agree with petitioners that it is not possible to glean from the Board's decision a rationale for granting the variances unrelated to the evidence of economic feasibility it purported to reject. But we do not agree with petitioners that for this reason the Board was required

---

4. Concerning the second and third requirements, the Board found "that granting the requested relief will not be of substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan." Petitioners do not challenge these findings in this court.

to reject the application. Instead we are of the view that the Board must either explain the non-economic reasons on which its decision purportedly rested, or else reconsider the decision in light of the evidence of economic justification outlined above. As we explain below, our precedents make clear that such evidence may indeed be considered in deciding whether area variances should be granted.

The Board cited three factors creating an exceptional condition in the property and resulting "hardship for the owner in meeting the" zoning requirements: "the narrowing of the lot at the rear, the location of neighboring structures at their contiguous property line[,] and the presence of the landmark structures." Nowhere did the Board explain how these factors justify the height and FAR variances without regard to the economic considerations it professed to reject. The sole place at which the Board referred to "the narrowness of the site" was in citing ANC–2A's approval of the plan;[5] but, as explained earlier, ANC–2A's approval rested critically on the fact that "additional height" was necessary "if the project were to be economically sound." The contiguity of the neighboring structures is mentioned nowhere else in the Board's decision, and its relation to the variances is unexplained. Reading the decision as a whole, we are convinced that the principal feature of the property which the Board believed justified the FAR and height variances was the Cooper Houses and the need to "compensate" for their preservation. But the *sole* link testified to by the developer between preserving the houses and the height and FAR variances was "economic feasibility," as the additional FAR needed to market the improved property (and indeed to obtain a construc-

tion loan) "drove the [request for additional] height."

In short, the Board's disavowal of reliance on economic factors seems inexplicable and prompts the reader to look for other language in the decision suggesting that it did not mean what it said. Intervenor calls our attention to one of the very last paragraphs of the decision where the Board did conclude that "it is impracticable because of the size and configuration of the lot[,] and the design requirements of the Historic Preservation Review Board tend to make full compliance restrictive, *prohibitively costly* and unreasonable" (emphasis added). But the "it" the Board referred to here was compliance with the standard setback requirements for roof structures, and the issue it was deciding was the applicant's separate request for a special exception from those requirements.[6] Thus, try as one might to the contrary, we are compelled to take at face value the Board's conclusion that it was not relying on economic factors; and we are unable to find in its decision any non-economic justification explained adequately to support the grant of the variances. *See Levy,* 570 A.2d at 746 ("conclusions legally sufficient to support the [Board's] decision [must] flow rationally from the findings").

Given the rationale which St. James and Bronberg frankly provided for the variances, the Board's refusal to consider economic factors may very well have stemmed from a misunderstanding of our precedents. Petitioners assert that "this Court has held repeatedly that the BZA does not have authority to grant variances to make a particular project economically feasible." Stated thus categorically, the contention is erroneous. We have never held that proof of economic burden is irrelevant to the

---

5. At the very end of its recommendation, ANC–2A had stated: "Although it would be our preference to have somewhat less height, we recognize the special problems created both by the narrowness of the site and the necessity of preserving the integrity of the Cooper Houses, a goal which is uppermost in our considerations."

6. 11 DCMR § 411.11 (1987) provides that, "where impracticable because of [enumerated] conditions ... that would tend to make full

compliance unduly *restrictive, prohibitively costly, or unreasonable,* the Board shall be empowered to approve the ... structure ... even if such structures do not meet the normal setback requirements ... " (emphasis added). Hence it is clear that in using identical language in its decision, the Board was concerned with the applicant's request for a special exception from the setback requirements, not the request for FAR and height variances.

decision whether to grant an area variance. To take just one case, we held quite the opposite in *Monaco v. District of Columbia Bd. of Zoning Adjustment*, 409 A.2d 1067 (D.C.1979), in sustaining the grant of a height variance which the BZA had expressly justified on grounds of economic feasibility. *Id.* at 1072 & n. 18. Petitioners cite decisions arising in the context of *use* variances, where we have indeed held that "the Board ... has no authority to grant a variance in order to assure the economic viability of the *use* of a particular property in a particular manner." *Silverstone v. District of Columbia Bd. of Zoning Adjustment*, 396 A.2d 992, 994 (D.C. 1979) (emphasis added); *see also Russell v. District of Columbia Bd. of Zoning Adjustment*, 402 A.2d 1231, 1236 n. 8 (D.C. 1979).[7] Even in the context of area variances, we have "reject[ed] any suggestion that *added expense alone* would entitle a property owner to a variance." *Draude v. District of Columbia Bd. of Zoning Adjustment*, 582 A.2d 949, 956 (D.C.1990) (emphasis added). But we have recently eliminated any doubt that "[e]conomic use of property" may properly be "considered as a factor in deciding the question of what constitutes an unnecessary burden or practical difficulty in [area] variance cases...." *Gilmartin*, 579 A.2d at 1170.

In *Gilmartin*, the court sought to harmonize several of our precedents and explain the relevance of economic hardship to the decision whether to grant an area variance. We pointed out that in *Barbour v. District of Columbia Bd. of Zoning Adjustment*, 358 A.2d 326 (D.C.1976), the court had sustained the denial of an area variance requested to permit expansion of a kitchen even though alternative methods of expansion (conforming with the regulations) "would [have] cost fifty to ninety percent more" and reduced the interior or backyard living space. *Gilmartin*, 579 A.2d at 1170. By contrast, in *Association for Preservation of 1700 Block of N St., N.W., & Vicinity v. District of Columbia Bd. of Zoning Adjustment*, 384 A.2d 674

(D.C.1978), the court upheld the grant of an area variance from off-street parking requirements because, although "[i]n both *Barbour* and *1700 Block* the practical difficulties were ones of increased costs and reduced enjoyment of the property," "it was clear that in the latter the costs were far larger and the restrictions upon use were far greater"; and in *1700 Block* "there was no feasible alternative that would have complied with the [zoning] regulations.... " *Gilmartin*, 579 A.2d at 1170. We summarized this distinction as follows:

Thus, *Barbour* suggests that a substantial increase in the cost of an intended improvement coupled with some loss in the overall utility of the property was not a practical difficulty that merited an area variance. *See also Myrick* [*v. District of Columbia Bd. of Zoning Adjustment* ], 577 A.2d [757,] 761–62 [D.C.1990] (cost of renovation of interior space insufficient to justify area variance where expansion of living space could be achieved in accordance with regulations). On the other hand, *1700 Block* indicates that at some point economic harm becomes sufficient, at least when coupled with a significant limitation on the utility of the [existing] structure [or property].

*Id.* at 1170–71.

We remanded in *Gilmartin* because the BZA had not adequately addressed the economic reasons offered by the applicant, noting that "[i]t is for BZA, in the first instance, to weigh carefully the claims of potential difficulty advanced here in light of *Barbour, 1700 Block,* and other applicable precedents." *Id.* at 1171. But we reiterated that "[i]ncreased expense and inconvenience to applicants for a variance are among the proper factors for BZA's consideration." *Id. See also Wolf v. District of Columbia Bd. of Zoning Adjustment*, 397 A.2d 936, 943 (D.C.1979) (Board properly granted area variance to permit conversion to three-unit rental apartment where "marketability" of property would otherwise be

---

7. "In the context of *use* variances, this court has held 'an inability to put property to a more profitable use or loss of economic advantage is

not sufficient to constitute hardship.'" *Russell,* 402 A.2d at 1236 n. 8 (emphasis in original) (quoting *Palmer,* 287 A.2d at 542).

"unfeasible" and investment would yield loss rather than profit); *Russell,* 402 A.2d at 1236 (area variance properly granted "where the owner could never sell the unimproved lot for a [permitted] residential use absent a variance"); *see generally* AR-DEN H. RATHKOPF & DAREN A. RATHKOPF, THE LAW OF ZONING & PLANNING § 38.04, at 38–48 to 38–53 (1991) (discussing need to prove "significant economic injury" in order to show practical difficulty).

As in *Gilmartin,* it is for the BZA, should it no longer endeavor to justify its decision on non-economic grounds,[8] to decide in the first instance whether the evidence of economic feasibility in this case is sufficient to warrant the FAR and height variances. Our cases uniformly hold that "the 'nature and extent of the burden which will warrant an area variance is best left to the facts and circumstances of each particular case.'" *Gilmartin,* 579 A.2d at 1171 (quoting *Wolf,* 397 A.2d at 942). Though the testimony offered by the applicant, if credited, suggests that St. James was not merely seeking "the most profitable use for [its] land," *Russell,* 402 A.2d at 1236, but faced difficulty financing *any* improvement of the property without the variances, it is the Board's task to decide on which side of the—necessarily imprecise—line drawn by *Gilmartin* the evidence in this case falls.[9] In remanding, we hold only that if the Board elects not to explain further the non-economic justifications on which it purported to base its decision, it must address the evidence of economic feasibility and make explicit findings relevant to it.

Accordingly, the decision of BZA is vacated insofar as it grants the FAR and height variances and the case is remanded for further consideration in light of this opinion.

*So ordered.*

---

8. *Cf. United Unions, Inc. v. District of Columbia Bd. of Zoning Adjustment,* 554 A.2d 313, 318 (D.C.1989) ("financial needs" not basis of Board's grant of variances; "rather, the peculiar difficulties of adding on to the original Corcoran building seem to comprise the practical difficulties that the variances were designed to surmount").

9. In light of our decisions, we reject petitioners' argument that the prohibitive cost of preserving

the Cooper Houses was a difficulty the applicant (and the prospective purchaser) could have foreseen and that this "self-imposed" hardship by itself required denial of the variances. *See Gilmartin,* 579 A.2d at 1171 ("prior knowledge or self-imposition of the difficulty ... [is] but one of the many factors that BZA [may] consider in reaching its decision"); *Russell,* 402 A.2d at 1236 n. 7; *1700 Block,* 384 A.2d at 678.